IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ROBERT CRAWFORD and JOSEPH SHORETTE, | ) ) ) | |
| Plaintiffs, | ) ) ) ) | |
| vs. | ) ) ) | CASE NO. 3:10-00628 JUDGE CAMPBELL/KNOWLES |
| PACE INDUSTRY UNION-MANAGEMENT PENSION FUND (PIUMPF), | ) ) ) ) ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

**I. Introduction and Background**

This matter is before the Court upon Plaintiffs' "Motion for Summary Judgment on Count I of Amended Complaint," filed by Plaintiffs. Docket No. 68. Plaintiffs have submitted a supporting Memorandum (Docket No. 69) and a Statement of Uncontested Material Facts (Docket No. 70). Defendant has submitted a Response in Opposition to the Motion (Docket No. 80), and a Response to Plaintiffs' Statement of Uncontested Material Facts. Docket No. 79. With leave of Court (Docket No. 82), Plaintiffs have filed a Reply to Defendant's Response (Docket No. 83). Judge Campbell has referred the instant Motion to the undersigned for a Report and Recommendation. Docket No. 71.

Plaintiffs filed this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiffs essentially aver, in their "Amended ERISA

Complaint" (Docket No. 50), that they both have a lengthy history of employment in the paper industry in Maine. They had worked with several different employers, but their longest employment was with Great Northern Paper Company. Both Plaintiffs ended their careers at Lincoln Paper & Tissue, LLC ("LPT"), and both were members of the United Steelworkers Local Union 1-0396. They were also eligible for coverage under Defendant's Pension Plan and were so covered.

Plaintiff Crawford ultimately took an early retirement, based in part upon Defendant's "assurance" that he would qualify for and receive a pension payment of $1,009 per month. Plaintiff Shorette applied for and received disability retirement benefits, and he was "assured" of benefits in the amount of $1,142 per month.

Approximately three years after they began receiving their benefits, Plaintiffs were notified by Defendant that their pension grants had been based upon material misinformation, that their pensions were being "rescinded," and that they owed Defendant approximately $40,000 each for the prior erroneous pension benefit payments. Defendant's stated reason for rescinding the pension benefits was that Plaintiffs were not entitled to "Past Service Credit" for earlier work in the industry.

Plaintiffs aver that Defendant's decision was not based upon any mistake of material fact, but was based solely on the growing fear of Defendant's Trustees that "they might be held liable for the Fund's shrinking assets." Docket No. 50, p. 13. In this regard, Plaintiffs argue that the fair market value of Defendant's assets had declined by "nearly half a billion dollars," between December 31, 2007, and December 31, 2008. *Id*., p. 14-15.

Plaintiffs, therefore, filed the instant action alleging that Defendant had breached the

appropriate plan provisions and that Defendant was equitably estopped under the federal common law of ERISA to rescind Plaintiffs' benefits.

In the instant Motion, Plaintiffs seek a judgment that they are entitled to benefits under the Plan. Plaintiffs have not, however, sought summary judgment concerning their equitable estoppel theory.[1]

Defendant's position is that the award of benefits to both Plaintiffs was based on material misinformation that was supplied to Defendant by LPT concerning the dates that Plaintiffs began working for LPT. Defendant argues that, when it learned of the misinformation, it properly rescinded Plaintiffs' pension benefits under the plain language of the Plan.

## II. <u>Undisputed Material Facts</u>

The following facts are taken primarily from Defendant's Response to Plaintiffs' Statement of Uncontested Material Facts.[2] Docket No. 79. The Court will also rely upon materials in the "Administrative Record," which has been filed herein as Docket Numbers 54-1 and 55-1, and which are cited extensively in Plaintiffs' Statement of Uncontested Material Facts.[3] The Plan at issue, headed "Pace Industry Union-Management Pension Plan," is part of

---

[1] Defendant has filed a Motion to Dismiss Plaintiffs' claims based upon equitable estoppel, which Motion will be addressed in a separate Report and Recommendation. Docket No. 61.

[2] Many of the alleged material facts in Plaintiffs' statement are not material to any issue before the Court.

[3] Docket No. 54-1 pertains to Plaintiff Crawford. Docket No. 55-1 pertains to Plaintiff Shorette. There are a number of duplications in these two documents. In citing to the Administrative Record, the Court will cite to these two Docket entries and the page numbers of those Docket entries as they exist in the Court's Electronic Case Filing System.

the Administrative Record, and there are no disputes as to the actual language of the Plan.[4]

The Defendant Pension Fund is a multi-employer benefit plan as defined by Sections 3(3) and 3(37) of ERISA, 29 U.S.C.§§ 1002(3) and 1002(37). *See Beck v. Pace International Union*, 551 U.S. 96, 99 (2007). Plaintiffs were employees at LPT, a contributing employer to the Fund, and are participants in the Fund. Both Plaintiffs were covered under "Program A." LPT had purchased the assets of a bankrupt entity known as Lincoln Pulp and Paper ("LPP"), and LPT began operating on or around May 28, 2004.

Plaintiff Robert Crawford worked as a millwright in the paper industry for Great Northern Paper Company from 1972 to October 2002 without a break in service. Docket No. 79, p. 2. Great Northern Paper Company was not a contributing employer to Defendant Fund. In October 2003, Plaintiff Crawford was hired by LPP. *Id.,* p. 3. That entity went bankrupt in January 2004. *Id*. The assets of that entity were purchased out of bankruptcy by a newly formed company named Lincoln Paper and Tissue. *Id*. Plaintiff Crawford went to work for LPT with a date of hire of May 28, 2004, and a first day of actual work of June 1, 2004. *Id*.

In the fall of 2005, Defendant's Trustees awarded Plaintiff Crawford an early retirement pension with an effective date of November 1, 2005. *Id*., p. 5. The award gave Plaintiff Crawford 32 years of service credit, which included 30.25 years of past service credit. *Id*, p. 5. Plaintiff Crawford had worked for LPT for only approximately 17 months, from early June 2004 to November 1, 2005.

On February 10, 2009, Defendant ceased paying pension benefits to Plaintiff Crawford. *Id.,* p. 6. Defendant sent Plaintiff Crawford a letter dated February 10, 2009, which explained

---

[4] The Plan is 125 pages long, and can be found at Docket No. 54-1, p. 185-310.

the reasons for rescinding his pension benefits. Docket No. 54-1, p. 27. Plaintiff Crawford timely appealed the revocation of his pension benefits, and he received a letter dated November 24, 2009, from Defendant denying his appeal.[5] Docket No. 54-1, p. 2.

Plaintiff Joseph Shorette first began working for Great Northern Paper Company in 1974 and worked there as a utility laborer until December 2002.[6] Docket No. 79, p. 8. Plaintiff Shorette was employed by an employer (Great Northern Paper Company) in non-covered employment and was represented by the Pulp and Sulphite Union on February 28, 1980, under a collective bargaining agreement with Great Northern.

Plaintiff Shorette states that he was "actually hired by Lincoln Paper and Tissue on June 28, 2004, but [he] didn't report to work until July 5, 2004, because of the Fourth of July, 2004." Docket No. 38-2.

Effective February 1, 2006, Plaintiff Shorette was awarded a pension in the amount of $1,142.00 payable monthly based on disability.[7] Docket No. 79, p. 25. Plaintiff Shorette had worked for LPT for only approximately 18 months, from early July 2004 to February 1, 2006.

On February 4, 2009, Defendant ceased paying pension benefits to Plaintiff Shorette, and Defendant sent him a letter that explained the reasons for rescinding his pension benefits.

---

[5] Plaintiff claims that the reason for Defendant's revocation of Plaintiff's pension benefits "has only been vaguely stated and remains unclear." Docket No. 69, p. 7. Contrary to Plaintiff's argument, however, the two letters referred to set out in detail the reasons for Defendant's actions. While it is not directly relevant to the issues before the Court, those letters essentially state that Plaintiff's employer, LPT, had erroneously advised Defendant that Plaintiff had been an employee of LPT since October 27, 2003.

[6] Again, Great Northern Paper Company was not a contributing employer to Defendant Fund.

[7] Plaintiff Shorette's disability itself is not an issue in this action. Docket No. 79, p. 19.

5

Docket No. 55-1, p. 197. Plaintiff Shorette timely appealed the revocation of his pension benefits, and he received a letter dated November 24, 2009, from Defendant denying his appeal.[8]

In a Financial Statement covering the period from December 31, 2007 through December 31, 2009, the Plan noted that, as of December 31, 2007, the fair market value of the Plan's assets was $1,956,057,565.00. As of December 31, 2008, the fair market value of the Plan's assets had dropped to $1,404,241,222.00. This represents a loss in value of over $500 million, or more than 25% of the Fund's total asset value.[9] Docket No. 79, p. 10.

The Plan defines the term "Contribution Date" as follows:

> The term "Contribution Date" shall mean the first date for which a Contributing Employer is obligated to contribute to the Pension Fund on behalf of a Covered Employee.

Docket No. 54-1, p. 194.

LPT's "Contribution Date" is July 1, 2004. Docket No. 79, p. 30.

### III. Summary Judgment Standards

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To prevail, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the

---

[8] Once again, the referenced letters explain that LPT supplied erroneous information that Plaintiff Shorette began employment with LPT on June 28, 2004, and that he worked 1200 hours in the year ending on LPT's Contribution Date, July 1, 2004.

[9] Plaintiffs concede, however, that the financial condition of Defendant "is not strictly speaking relevant to a dispute over the plain language of a contract or Plan . . . ." Docket No. 69, p. 9.

opposing party's claim. *See Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 202 (1986); *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the non-moving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If a non-moving party, however, fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23. When this occurs, the moving party is entitled to summary judgment as a matter of law. *Id*. at 322-23; *Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).

### IV. Standard of Review

The Plan document at issue gives the Trustees discretionary authority to determine eligibility for benefits. Article V, Section 5 of the Plan states in relevant part:

> Notwithstanding any other provision of the Plan, the Trustees shall have exclusive authority and discretion to:
>
> (a) determine whether an individual is eligible for any benefits under the Plan.

Docket No. 94-1, p. 232.

Additionally, Article V, Section 14 of the Plan states in relevant part:

> The Trustees shall construe the terms and provisions of the
> Plan . . . . The decision of the Board of Trustees is final and
> binding.

Docket No. 94-1, p. 237-39.

Therefore, even if the Court finds the Plan language to be ambiguous, the Court can reverse the Trustees' determination only if it is "arbitrary and capricious." *See Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 111 (2008); *Firestone Tire & Rubber Co.*, v. *Bruch,* 489 U.S. 101, 111-13 (1989); *Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 617 (6th Cir. 2006). The arbitrary and capricious "standard is extremely deferential and has been described as the least demanding form of judicial review." *McDonald v. Western-Southern Life Ins. Co.,* 347 F.2d 161, 172 (6th Cir. 2003). As the Sixth Circuit has also stated, a Court applying the arbitrary and capricious standard of review:

> will uphold a benefit determination if it is rational in light of the
> plan's provisions. When it is possible to offer a reasoned
> explanation, based on the evidence, for a particular outcome, that
> outcome is not arbitrary or capricious. Indeed, we must accept a
> Plan Administrator's rational interpretation of a Plan even in the
> face of an equally rational interpretation offered by participants.

*Gismondi v. United Technologies Corp.,* 408 F. 3d 295, 298 (6th Cir. 2005).

### V. **Plan Provisions and Analysis**

There is no dispute between the parties as to the provisions of the Plan at issue. As Plaintiffs recognize, "Section 401(a)(1)(d) of ERISA [29 U.S.C. § 1104(a)(1)(d)] provides that Plan fiduciaries, of which the Plan Administrator is one, shall act in accordance with the terms of the documents and instruments governing the Plan insofar as those documents and instruments are consistent with ERISA." Docket No. 69, p. 1, *citing Durand v. Hanover Ins. Group, Inc.,* 560 F.3d 436, 442 (6th Cir. 2009).

For ease of understanding, the Court will address separately the claims of the two Plaintiffs; while there are slight differences in the situations of the two Plaintiffs, the overall analysis is generally the same.

## A. Robert Crawford

As discussed above, Plaintiff Crawford was initially granted an Early Retirement Pension, which Defendant later rescinded. The logical starting point for a discussion of the issues involved in Plaintiff Crawford's claims is the Plan provision concerning entitlement to an Early Retirement Pension. Article IV, Section 7 of the Plan document states in relevant part:

> A Participant shall be entitled to an Early Retirement Pension if he retires between the ages of 55 and 65 with at least 10 years of Pension Credit or Vesting Service.

Docket No. 94-1, p. 214.

Thus, in order to be entitled to an Early Retirement Pension, Plaintiff Crawford must have had at least 10 years of Pension Credit *or* at least 10 years of Vesting Service.

### 1. Pension Credit

The first question, therefore, becomes whether Plaintiff Crawford had accumulated 10 years of Pension Credit. Article III of the Plan governs "Accumulation of Pension Credit and Vesting Credits." Docket No. 94-1, p. 203. Pension Credit can consist of Future Service Credit or Past Service Credit. *Id.*, p. 203-06.

#### a. Future Service Credit

Future Service Credit is credit received for periods of time for which contributions were required to be made to the Pension Fund on behalf of the Covered Employee. Thus, Future Service Credit is generally earned for a Participants' work that occurs after he becomes covered

9

by the Plan.

With regard to Future Service Credit, Article III, Section 2 of the Plan provides in relevant part, "A Covered Employee shall receive credit for Future Service in each calendar year based on the number of Hours of Service for which contributions were required to be made to the Pension Fund on his behalf." *Id.*, p. 205. The earliest date for which contributions could have been required to be made to the Pension Fund on behalf of Plaintiff Crawford was May 28, 2004.[10] It is undisputed that Plaintiff Crawford earned 1.75 years of Future Service Credit between that date and the date of his retirement. Therefore, in order to be eligible for an Early Retirement Pension, Plaintiff Crawford needed an additional 8.25 years of Past Service Credit.

b. Past Service Credit

As Plaintiffs state, "Past Service Credit" is "[g]enerally . . . simply credit for Past Service in the industry before the employee becomes covered under the PIUMPF Plan." Docket No. 69, p. 11. Past Service Credit can be earned by a Participant for work for previous employers, but only if certain conditions are fulfilled.

There are two different general provisions concerning eligibility for Past Service Credit, one that applies if a Participant entered Covered Employment on or before August 17, 1982, and one that applies if the Participant entered Covered Employment after August 17, 1982. Each of these alternatives, however, requires a Participant to have 5 or more years of Future Service Credit in order to be eligible for Past Service Credit. For ease of reference, Plaintiffs have referred to these two alternative provisions as the "Five-year Rule." There is an exception to the requirements of both alternatives, which Plaintiffs have referred to as the "1200 Hour

---

[10] As discussed above, LPT did not begin operations until on or about May 28, 2004.

Alternative" to the Five-year Rule, which will be discussed below.

Article III, Section 1 provides in relevant part as follows:

> PENSION CREDIT FOR PERIODS BEFORE COVERED EMPLOYMENT STARTS.
>
> (a) **Applicability of Past Service Credit Provisions.** Past Service Credit is available to Program A . . . Covered Employees for purposes of calculating (1) Vesting Credit, (2) Pension Credit, and (3) to determine eligibility for an Early Retirement Pension . . . .
>
> (b)(1) **Eligibility for Past Service Credit.** To the extent applicable in paragraph (a), a Program A . . . Covered Employee qualifies for Past Service Credit if:
>
>> (i) he entered Covered Employment on or before August 17, 1982, he has 5 or more years of Future Service Credit, unless Section (b)(2) below applies; or
>>
>> (ii) he entered Covered Employment after August 17, 1982, he is employed as a Covered Employee on his Contributing Employer's Contribution Date and has 5 or more years of Future Service Credit, unless Section (b)(2) below applies.

*Id.*, p. 203.

Plaintiff Crawford did not have 5 or more years of Future Service Credit, so he did not meet the eligibility requirements of Article III, Section 1(b)(1)(I) or (ii).[11]

Thus, the only way Plaintiff Crawford could be eligible for Past Service Credit consistent with the above-quoted provisions, is under Article III, Section 1(b)(2), the "1200 Hour Alternative" to the Five-year Rule, which provides in relevant part as follows:

---

[11] While this is not the only reason Plaintiff Crawford did not meet these requirements, this reason alone renders him ineligible under the referenced sections (unless the exception applies).

11

> (b)(2) **Elimination of Future Service Credit Requirement.**
> Effective February 28, 1980, a Program A . . . Covered
> Employee . . . who has less than 5 years of Future Service Credit
> qualifies for Past Service Credit if he meets *both* of the following
> two requirements:
>
> > (i) he is employed as a Covered Employee on his
> > Contributing Employer's Contribution Date; *and*
> >
> > (ii) he worked at least 1,200 hours in the twelve
> > month period ending on such Contribution Date.

*Id.,* (Emphasis added.)

Plaintiff Crawford was employed as a Covered Employee on his Contributing Employer's Contribution Date; therefore, he meets the requirements of Article III, Section 1(b)(2)(I). He does not, however, meet the requirements of Article III, Section 1(b)(2)(ii), because he did not work at least 1,200 hours in the twelve month period ending on LP&T's Contribution Date (July 1, 2004).[12]

Plaintiff Crawford, therefore, had zero years of Past Service Credit under the above-referenced provisions.

Plaintiff Crawford appears generally to agree with the analysis discussed above. His main argument appears to be that he is entitled to Plan benefits under Article III, Section 1(b)(4), which states as follows:

> If an employee cannot meet the foregoing tests, he may qualify for
> Past Service under the Plan rules in effect on February 27, 1980 if
> he was employed in Covered Employment on February 28, 1980,
> or if on February 28, 1980 he was employed by an Employer in
> non-Covered Employment and had then met the requirements of

---

[12] Plaintiffs concede that they "could not possibly meet the 1200 hour requirement because their final employer, Lincoln Paper & Tissue, only came into existence a month prior to its first Contribution Date." Docket No. 79, p. 17.

Article III, Section 6 hereof.

Docket No. 94-1, p. 204.

Article III, Section 6 states as follows:

> FUTURE SERVICE REQUIREMENT
>
> Notwithstanding any other provision of this Plan, as a prerequisite for entitlement to any benefits provided by this Pension Fund, a Participant must complete at least two quarters of Future Service Credit. If a Participant's effective date of retirement is within two years of the Contribution Date applicable to his collective bargaining unit, an exception may be made to this requirement provided the Participant was in Covered Employment for at least 880 hours for which contributions were made to this Fund on his behalf over a period of two consecutive calendar years.

*Id.,* p. 210.

Plaintiffs' argument concerning these provisions is confusing, inconsistent, and flawed. Plaintiffs argue in relevant part as follows:

> The plain language of Article III, Section 1(b)(4) clearly encompasses the relevant facts pertaining to each Plaintiff both of whom were employed on February 28, 1980 employed by an employer (Great Northern) in non-covered employment (different union, different pension) and had *then* met the requirements of Article III, Section 6. . . . It is simply the case that the Plaintiffs were on February 28, 1980 employed by an employer in non-covered employment and *subsequently* met the requirements of Article III, Section 6.
>
> The Defendant has not ever explained why the Plaintiffs do not satisfy Section 1(b)(4). One can only imagine the Defendant might argue that Article III, Section 1(b)(4) does not apply to the Plaintiffs because the phrase "had then met the requirements of Article III, Section 6" means that an employee had to have met those requirements on February 28, 1980.

Docket No. 69, p. 14-15 (emphasis added).

Plaintiffs proceed to explain why "then" could not be intended to denote February 28,

13

1980, because such an interpretation would result in a contradiction and it would make the second qualification stated in Article III, Section 1(b)(4) meaningless.

In response to this argument, Defendant relies on the plain language of Article III, Section 1(b)(4). Defendant also explains why the plain language of the referenced provision does not result in contradictions and does not make the second qualification of Article III, Section 1(b)(4) meaningless. *Id.,* p. 10.

Plaintiff has filed a Reply that attempts to bolster his position on this point. Docket No. 83. With all respect, the Court finds it difficult to understand Plaintiff's Reply. Plaintiff criticizes Defendant's hypotheticals as being "absurdly narrow by virtue of the required requirement date of February 28, 1980." *Id.*, p. 2. Regardless of how absurdly narrow those hypotheticals are, they are consistent with the plain language of the Plan. Plaintiff next discusses the Plan's break in service rules. *Id.*, p. 3-4. Again, the Court simply does not understand that argument or how it relates to the Plan at issue. In his Reply, Plaintiff also states:

> The Defendant appears not to understand that "had then" is used in the future perfect tense to explain that older employees in non-covered employment as of February 28, 1980 who later became participants by virtue of subsequent employment in the same industry with a Contributing Employer and as a consequence of that future event had then met the requirements of Article III, Section 6 hereof would then become eligible for an award of Past Service Credit. The clause simply consolidates events in time as preconditions for a final future event, retirement based on Past Service Credit added to Future Service Credit.

Docket No. 83, p. 5.

The foregoing quotation appears to the undersigned to be an excellent example of an *ipse dixit*. Moreover, the "future perfect tense" is:

> A verb form that expresses action completed by a specified time in

14

> the future. The future perfect is formed by combining will have or
> shall have with a past participle.

*http://grammar.about.com/od/fh/g/futperftense.htm,* accessed May 18, 2011. Despite Plaintiff's statement, "had then" has nothing to do with the future perfect tense.

As discussed above, it is the Court's obligation to interpret the Plan Provisions in accordance with the ordinary meaning of the words contained therein. Plaintiff Crawford clearly was not employed in Covered Employment on February 28, 1980. Thus, the only way he could qualify for Past Service Credit under Article III, Section 1(b)(4) would be to meet the requirements of the second provision of Article III, Section 1(b)(4), namely that "on February 28, 1980, he was employed by an Employer in non-Covered Employment and *had then met* the requirements of Article III, Section 6 hereof." (Emphasis added.)

Plaintiff Crawford simply cannot show that he had "then," *i.e.*, on February 28, 1980, "met the requirements of Article III, Section 6" of the Plan. In fact, Plaintiff never actually argues as much. Instead, Plaintiff argues that "then," cannot mean February 28, 1980, but somehow means the date of Plaintiff's retirement. Plaintiff never explains how he reaches this conclusion.

### 2. Vesting Service

As discussed above, Plaintiff Crawford would be entitled to an Early Retirement Pension if he had at least 10 years of "Vesting Service" pursuant to Article IV, Section 7. Docket No. 94-1, p. 214. While Plaintiff Crawford does not specifically argue that he is entitled to an Early Retirement Pension on the basis of his Vesting Service, the Court will consider that issue.

Vesting Service is governed by Article III, Section 3 of the Plan, which provides in relevant part as follows:

15

>Years of Vesting Service.

>(a) **General Rule.** A Participant shall be credited with:

>>(i) One year of Vesting Service for each calendar year ending after the Contribution Date, as defined in Section (c) below, including periods before he became a Participant, in which he completes at least 1,000 Hours of Service in Covered Employment, plus

>>(ii) One year of Vesting Service for each year of Past Service Credit earned in calendar years ending before the Contribution Date.

Docket No. 94-1, p. 206.

As discussed above, Plaintiff Crawford had at most 1.75 years of employment after the Contribution Date and, therefore, presumably he had 1.75 years of Vesting Service. Because he did not receive Past Service Credit, however, he did not have 10 years of Vesting Service.

For the foregoing reasons, Plaintiff Crawford did not have at least 10 years of "Pension Credit or Vesting Service," as required by Article IV, Section 7 of the Plan.

### B. Joseph Shorette

Plaintiff Shorette received a Disability Pension, not an Early Retirement Pension. In order to be eligible for a Disability Pension, Plaintiff Shorette must have accumulated at least 10 years of Pension Credit with at least 2 quarters of Future Service Credit, at the time the total and permanent disability commenced. Article IV, Section 11 states in relevant part:

>(a) **Eligibility.** A Participant shall be entitled to retire on a Disability Pension if he meets all of the following conditions:

>>(i) He becomes totally and permanently disabled as defined in Section (b) below while working in Covered Employment, and

16

> (ii) For Program A . . . Covered Employees, he has
> accumulated at least 10 years of Pension Credit
> with at least 2 quarters of Future Service Credit at
> the time the total and permanent disability
> commences.

Docket No. 94-1, p. 215.

The remaining analysis for Plaintiff Shorette is essentially the same as for Plaintiff Crawford. Plaintiff Shorette had approximately 19 months (approximately 1.6 years) of Future Service Credit (July 5, 2004 to February 1, 2006). Thus, in order to be eligible for a disability retirement pension, Plaintiff Shorette needed an additional approximately 8.4 years of Past Service Credit. Like Plaintiff Crawford, Plaintiff Shorette cannot meet the "Five-year Rule," nor can he meet the 1200 hour alternative to the Five-year Rule. And, for the reasons stated above, Plaintiff Shorette cannot show that he was entitled to pension benefits under Article III, Section 1(b)(4).

Therefore, Plaintiff Shorette was not eligible for a Disability Pension because he did not accumulate at least 10 years of Pension Credit.

### C. Conflict of Interest

Plaintiffs also argue that the Trustees had a conflict of interest in determining whether to revoke Plaintiffs' Pension Benefits because the value of the Plan's assets had declined by approximately $500 million in the year preceding December 31, 2008.

The Supreme Court has recognized the proposition that a Plan Administrator or employer who both evaluates claims for benefits and pays benefits claims may have a conflict of interest. *See Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 112 (2008). In *Glenn*, the Court stated:

> In such a circumstance, "every dollar provided in benefits is a
> dollar spent by . . . the employer; and every dollar saved . . . is a

dollar in [the employer's] pocket."

*Id., quoting Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134, 144 (3rd Cir. 1987).

The *Glenn* Court further recognized "the legal need for a judge . . . to take account of that conflict in reviewing the trustee's discretionary decision making." 554 U.S. at 113. The Court stated that such a conflict should be weighed as a factor in determining whether there is an abuse of discretion. *Id*. at 115 (citations and quotation marks omitted).

The Fund at issue is a Taft-Hartley multi-employer Pension Plan, the Trustees of which consist of an equal number of Union and employer representatives. *See* 29 U.S.C. § 186(c)(5)(B); *Connolly v. Pension Benefit Guaranty Corp*., 475 U.S. 211, 232 (1986) (O'Connor, J.); *http://cms.uswbenefitfunds.com/trustees,* accessed May 19, 2011, (showing four labor trustees and four management trustees for PIUMPF). The Sixth Circuit has stated that the Trustees of such Funds do not have the same type of conflicts that employers or insurance companies might have. *See Klein v. Cent. States, Southeast & Southwest Areas Health & Welfare Plan*, 346 Fed. Appx. 1, 5 (6th Cir 2009). The *Klein* Court stated:

> The Plan is a multi-employer benefit Plan without a profit motive, and individual trustees receive no personal financial benefit from approving or denying claims. Several courts have considered this issue and concluded that this structure does not create an inherent conflict of interest.

*Id.,* (*citations omitted*).

Even considering any potential conflict, however, the Court concludes that the possible conflict is essentially insignificant. Plaintiffs in the case at bar were receiving yearly pensions in the approximate amount of $12,000 each. Assuming that each of them had lived another 20 years, the total pension payout for both would have been approximately $480,000. This amount

18

is essentially a drop in the bucket compared to the approximately $2 billion of Fund assets in late 2007, or the approximate $1.4 billion in Fund assets on December 31, 2008.

In their Reply, Plaintiffs also raise, at least tangentially, an issue concerning the fact that the Summary Plan Description ("SPD") is not in the Administrative Record. Their entire argument on this issue is as follows:

> The second issue raised by the Defendant in its opposition is its assertion of entitlement to discretionary review. There is language that would ordinarily accord a plan administrator entitlement to discretionary review in the plan itself. However, it is not in the Summary Plan Description which likely explains why the Defendant omitted the SPD from the Administrative Record.

Docket No. 83, p. 5-6.

The relevance of this point is extremely unclear. Plaintiffs never argue that the omission of the SPD from the Administrative Record is improper under any standard. Moreover, the provisions of the SPD should not be considered by the Court, precisely because it is not a part of the Administrative Record. Even assuming that the SPD does not address the Administrator's entitlement to discretionary review, Plaintiffs have cited no authority for the proposition that the omission somehow changes the scope of this Court's discretionary review. In fact, the Sixth Circuit has rejected just such an argument. *See Bellurdo v. Cox Enter., Inc.,* 157 Fed. Appx. 823, 828 (6th Cir. 2005) (SPD and Plan do not conflict where SPD is silent as to discretion afforded to Plan Administrator).

## VI. Conclusion and Recommendation

For the foregoing reasons, the Court concludes that, while there is no genuine issue as to any material fact, Plaintiffs are not entitled to a judgment as a matter of law. Therefore, Plaintiffs' "Motion for Summary Judgment on Count I of Amended Complaint" (Docket No. 68)

should be DENIED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

                                                E. Clifton Knowles
                                                United States Magistrate Judge