UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ROBERT CRAWFORD and )
JOSEPH SHORETTE, )
 )
    Plaintiffs, )
 )    No. 3:10-cv-628
v. )
 )    Judge Sharp
PACE INDUSTRY )
UNION-MANAGEMENT )
PENSION FUND (PIUMPF) )
 )
    Defendant. )

## MEMORANDUM

Three years after retiring with the understanding that they would receive pension payments for the duration of their lives, Plaintiffs Robert Crawford and Joseph Shorette received distressing letters from Defendant PACE Industry Union-Management Pension Fund. Not only would Crawford and Shorette stop getting the monthly pension payments they had received for three years, the letters said, but each man also owed the Fund approximately $40,000 for erroneously paid benefits. The letters explained that Plaintiffs' eligibility for benefits was based on incorrect information their former employer supplied to the Fund. After the Fund denied their internal appeals, Crawford and Shorette filed this suit alleging various violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq*.

Three matters are now before the Court. First, both parties move for summary judgment with respect to Count I, Plaintiffs' denial-of-benefits claim brought under ERISA § 502(a)(1)(B),

1

29 U.S.C. § 1132(a)(1)(B). (Docket Nos. 68 & 94). Second, the Fund seeks dismissal of Count II, Plaintiffs' equitable-estoppel claim brought under ERISA § 502(a)(3), *id*. § 1132(a)(3). (Docket No. 61). Finally, the Fund moves for summary judgment on counterclaims it asserted seeking recovery of the benefits the Fund erroneously paid out to Plaintiffs. (Docket No. 94).

The Magistrate Judge entered three Reports and Recommendations (R & Rs) addressing these motions. With respect to Count I, the Magistrate Judge recommends that the Court deny Plaintiffs' summary-judgment motion, (Docket No. 91), and grant the Fund's cross-motion for summary judgment, (Docket No. 114). With respect to Count II, the Magistrate Judge recommends that the Court grant the Fund's motion to dismiss. (Docket No. 92). With respect to the counterclaims, the Magistrate Judge recommends that the Court grant the Fund's summary-judgment motion. (Docket No. 114). Plaintiffs timely filed objections to the Magistrate Judge's R&Rs. (Docket Nos. 99 & 117).

Reviewing these dispositive motions de novo, Fed. R. Civ. P. 72(b)(3), the Court will:

- ACCEPT the Magistrate Judge's R & Rs recommending summary judgment for Defendant and against Plaintiffs with respect to Count I, Plaintiffs' denial-of-benefits claim, (Docket Nos. 91 & 114);
- DENY Plaintiffs' summary-judgment motion as to Count I, (Docket No. 68);
- GRANT Defendant's summary-judgment motion as to Count I, (Docket No. 94);
- REJECT the Magistrate Judge's R &R recommending dismissal of Count II, Plaintiffs' equitable-estoppel claim, (Docket No. 92);
- DENY Defendant's motion to dismiss Count II, (Docket No. 61);
- REJECT the Magistrate Judge's R & R recommending judgment for Defendant on its counterclaims against Plaintiffs for previously paid benefits, (Docket No. 114); and
- DENY WITHOUT PREJUDICE Defendant's summary-judgment motion as to its counterclaims, (Docket No. 94).

# **BACKGROUND**[1]

The Fund is a multi-employer benefit plan as defined by Sections 3(3) and 3(37) of ERISA, 29 U.S.C.§§ 1002(3) & 1002(37).[2] Plaintiffs Crawford and Shorette ended their careers in Maine's paper industry at Lincoln Paper & Tissue, LLC (LPT), a company that began operating on or around May 28, 2004, and was a contributing employer to the Fund. Both Plaintiffs brought decades of industry experience to LPT. Crawford had worked as a millwright for Great Northern Paper Company from 1972 until October 2002, and Shorette put in time as a utility laborer for the same company from 1974 until December 2002. Great Northern was not a contributing employer to the Fund.

LPT hired Crawford on May 28, 2004, and his first day of work was June 1, 2004. Shorette was hired on June 28, 2004, and began working on July 5, 2004. Crawford worked for LPT until November 1, 2005, at which time the Fund awarded him an early-retirement pension of $1009 per month. Shorette worked for LPT until February 1, 2006, the day on which the Fund awarded him a disability pension of $1142 per month.

Approximately three years after Plaintiffs began receiving benefits, the Fund rescinded their pensions, terminating Crawford's on February 10, 2009, and Shorette's on February 4, 2009. In a letter sent to each Plaintiff, the Fund explained that their eligibility was based upon material misinformation LPT supplied to the Fund concerning the dates Plaintiffs began working

---

[1] The Magistrate Judge's telling—which relied mostly on Defendant's Response to Plaintiffs' Statement of Uncontested Material Facts, (Docket No. 79), as well as materials in the Administrative Record, (Docket Nos. 54-1 & 55-1)—is largely the basis for this factual background, (Docket No. 91).

[2] The terms the Fund, the Plan, and PIUMPF are used interchangeably to refer to Defendant and its pension plan. While PIUMPF is the Fund and the Plan is one of the Fund's offerings, the distinction doesn't matter in this case.

for the company. In light of the correct information the Fund now possessed, the Fund determined that Plaintiffs were not eligible for pension benefits. The Fund also demanded that each Plaintiff repay approximately $40,000 he had received in erroneous pension benefits. Both Plaintiffs timely appealed. The Fund denied both appeals on November 24, 2009.

To understand the Fund's rationale, a review of the Plan's relevant provisions is necessary. While the starting points of the relevant Plan terms differ for Crawford and Shorette, the crux of their claim in this case focuses on the same provision. Crawford applied for an Early Retirement Pension under the Plan. To receive an Early Retirement Pension, a participant must retire "between the ages of 55 and 65 with at least 10 years of Pension Credit or Vesting Service." (Docket No. 54-1 at 214). Shorette, by contrast, applied for a Disability Pension. To be eligible for a Disability Pension, a participant must become totally and permanently disabled while working in Covered Employment[3] and accumulate "at least 10 years of Pension Credit with at least 2 quarters of Future Service Credit"—which amounts to 880 hours—when the disability commences. (*Id*. at 215).

Pension Credit can consist of Future Service Credit (FSC) or Past Service Credit (PSC). (*Id*. at 203–06). A Covered Employee earns FSC for periods that his employer makes required contributions to the Fund on his behalf. (*Id*. at 205). By contrast, a Covered Employee earns PSC for time spent working in the paper industry for an employer that does not participate in the Fund. Crawford did not earn FSC before working for LPT and earned only 1.75 years of FSC during his time with the company. (Docket No. 79 at 6). So he needed at least 8.25 years of PSC to meet the 10-year Pension Credit requirement. Shorette, too, did not earn FSC before

---

[3] Whether Shorette was totally and permanently disabled is not disputed. (Docket No. 96 at 8 n.4).

working at LPT. But he accrued 1.5 years of FSC while with LPT and so needed 8.5 years of PSC to meet the Pension Credit requirement. (*Id*. at 9).

The Plan provides three possible avenues for Plaintiffs to obtain PSC. (Docket No. 54-1 at 203–04). The first is what the parties dub the Five Year Rule, contained in Article III, Section 1(b)(1). (*Id*. at 203). The second is the 1200 Hour Alternative to that rule, described in Article III, Section 1(b)(2). (*Id*.). The third, described in Article III, Section 1(b)(4), is the crux of this case. (*Id*. at 204).

Plaintiffs do not claim they qualify under the Five Year Rule. And while the 1200 Hour Alternative appears to have been the basis for the Fund's rescission, (*see, e.g.*, *id*. at 2–3, 27–28), Plaintiffs do not claim that they are entitled to PSC under that provision. Instead, they rely on Article III, Section 1(b)(4), which provides that an employee may qualify for PSC

> under the Plan documents in effect on February 28, 1980 if he was employed in Covered Employment on February 27, 1980, or if on February 28, 1980 he was employed by an employer in non-Covered Employment and had then met the requirements of Article III, Section 6 hereof.

(*Id*. at 204). In turn, Article III, Section 6 states:

> Notwithstanding any other provision of this Plan, as a prerequisite for entitlement to any benefits provided by this Pension Fund, a participant must complete at least two quarters [880 hours] of Future Service Credit. If a participant's effective date of retirement is within two years of the Contribution Date applicable to his collective bargaining unit, an exception shall be made to this requirement provided the Participant was in Covered Employment for at least 880 hours for which contributions were made to the Fund on his behalf over a period of two consecutive calendar years.

(*Id*. at 210).

5

PIUMPF's position is that the plain language of Article III, Section 1(b)(4) requires an employee to have met the requirements of Article III, Section 6 *as of February 28, 1980*. (Docket No. 91 at 15). As Plaintiffs concede, they did not do so. (Docket No. 103 at 8 n.6). But Plaintiffs read Article III, Section 1(b)(4) differently. They argue the phrase "had then" is not fixed at February 28, 1980, but instead points to a future date. As a result, they say they are entitled to PSC because they 1) worked in non-Covered Employment for Great Northern on February 28, 1980, and 2) worked well in excess of 880 hours in Covered Employment at LPT before they retired.

In addition to disputing the meaning of "had then" in this provision, Plaintiffs allege that something entirely different was at play in the Fund's decision to terminate their pensions. Rather than any mistake of material fact, they contend that fears about the Fund's shrinking assets motivated the rescissions, pointing out that the value of those assets declined by nearly half a billion dollars—more than 25%—between December 31, 2007, and December 31, 2008.

## ANALYSIS

**I.  The parties' cross-motions for summary judgment on Count I**

The Court first considers the parties' cross-motions for summary judgment on Plaintiffs' denial-of-benefits claim brought under ERISA § 502(a)(1)(B) (Count I).

*A. Standard of review*

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir.

2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question is whether any genuine issue of material fact is in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported summary-judgment motion, the nonmoving party must set forth specific facts that show a genuine issue of material fact for trial. If the party does not do so, summary judgment may be entered. Fed. R. Civ. P. 56(e). The nonmoving party's burden to point to evidence demonstrating a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When ruling on cross motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

*B. Law*

ERISA § 502(a)(1)(B) allows a participant to bring a claim "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Benefits must be paid in accordance with the documents and instruments that govern the plan. *Kennedy v. Plan Adm'r. for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009). To recover plan benefits under § 502(a)(1)(B), a participant "must first qualify for the benefits provided in that plan." *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992).

7

The Court's review of benefits eligibility is limited to the administrative record that was before the plan administrator when the challenged decision to deny benefits was made. *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011). The Court reviews the denial decision de novo, unless the plan gives the administrator "discretionary authority to determine eligibility for benefits or to construe" the plan's terms. *Id.* at 342 (internal quotation marks omitted). If the administrator has such discretion, the Court asks only if the denial was arbitrary and capricious, thus applying "the least demanding form of judicial review of administrative action." *Id.* (internal quotation marks omitted). Arbitrary-and-capricious review requires an administrator's decision to be upheld as long as it is "rational in light of the Plan's provisions" and "supported by substantial evidence." *Id.* (internal quotation marks and alteration omitted). The administrator's rational interpretation of a plan will win the day even if the party challenging the denial offers an equally rational interpretation. *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004).

Arbitrary-and-capricious review, however, is not a rubber stamp of administrative action. *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010). While a plan administrator given appropriate discretionary authority has "great leeway in interpreting ambiguous terms," *Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 935 (6th Cir. 2000) (internal quotation marks omitted), "[d]iscretion to interpret a plan . . . does not include the authority to add eligibility requirements" to it, *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004).

*C. Analysis*

The arbitrary-and-capricious standard applies to Plaintiffs' denial-of-benefits claim because the Fund gives the Trustees who administer it wide-ranging authority to determine benefits eligibility and construe the Plan's terms. The Plan gives Trustee "exclusive authority and discretion to" determine "whether an individual is eligible for any benefits" and "the amount of benefits," as well as to interpret "all of the provisions" and "all of the terms used in the plan." (Docket No. 54-1 at 232). In view of this discretion, the Court will uphold PIUMPF's decisions to rescind Plaintiffs' pensions if those decisions are reasonable in light of the Plan's provisions.

The key provision at issue is Article III, Section 1(b)(4), which allows that a participant may be eligible for PSC if "on February 28, 1980 he was employed by an employer in non-Covered Employment and had then met the requirements of Article III, Section 6 hereof." (*Id.* at 204). The phrase "had then," says the Fund, means the requirements of Article III, Section 6—in effect, working 880 hours in Covered Employment—must have been met *by or before* February 27, 1980. Not so, Plaintiffs respond: the plain meaning of the phrase "had then" has no such temporal limitation, and a beneficiary is entitled to PSC if he met the 880-hour requirement anytime *after* February 27, 1980.

Whether the language of an ERISA plan is vague or ambiguous is "an objective inquiry." *Smiljanich v. Gen. Motors Corp.*, 302 F. App'x 443, 448 (6th Cir. 2008). In this case, read in isolation or in the context of other plan provisions, the Plan is ambiguous as to when the 880-hour precondition must be met. Both parties' interpretations are plausible, as the phrase "had then" is reasonably susceptible to either view of its temporal scope. Be that as it may, the Court does not need to resolve that ambiguity because PIUMPF's reading is eminently reasonable. The

9

Fund's view gives effect to all of the provision's words and is consistent with its plain language. And contrary to Plaintiffs' contentions, the Fund's interpretation plausibly describes the provision's beneficiaries. Consider an employee who worked for a Contributing Employer for 880 hours but then left to work for a non-Contributing Employer before February 28, 1980. If that employee returns to work for a Contributing Employer after February 28, 1980, Article III, Section 1(b)(4) enables him to count towards 10-year Pension Credit requirement the time he spent working for the non-Contributing Employer before February 28, 1980. It doesn't matter that the Fund's view is not the *only* rational one out there; no alternative, however fine, will defeat an administrator's rational reading. *Morgan*, 385 F.3d at 992.

Plaintiffs lean on language from a Summary Plan Description (SPD) that they think undermines the Fund's temporally limited interpretation. The SPD says: "[Y]ou may still qualify for [PSC] . . . if you were working in non-covered employment with the same employer on February 27, 1980 and complete two quarters of [FSC] *thereafter*." (Docket No. 54-1 at 131) (emphasis added). The SPD's use of "thereafter," Plaintiffs conclude, suggests an employee can earn PSC if he met the 880-hour FSC requirement anytime *after* February 27, 1980. Put differently, Plaintiffs say the SPD's use of the term "thereafter" conflicts with PIUMPF's view that an employee must have satisfied the 880-hour requirement by or before February 27, 1980.

But the SPD can't save Plaintiffs' § 502(a)(1)(B) claim. The "terms of an SPD cannot be enforced over conflicting terms of the employee benefit plan itself under ERISA § 502(a)(1)(B)." *Lipker v. AK Steel Corp.*, 698 F.3d 923, 931 n.4 (6th Cir. 2012) (citation omitted). Citing the Supreme Court's decision in *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1876–78 (2011), *Lipker* held that in the event of a conflict, "the plan language controls over the SPD." *Id*. Even if the

10

SPD points in the opposite direction of the Plan, Plaintiffs' § 502(a)(1)(B) claim still fails.

In the end, Plaintiffs' insistence that their § 502(a)(1)(B) claim is viable because the words "had then" in Article III, Section 1(b)(4) can mean "at some later time" is misplaced because the Fund's construction of this Plan term is reasonable. Because of that, and because Plaintiffs concede they are ineligible for benefits if the Fund prevails on this issue, the Court accepts the Magistrate Judge's recommendation to grant the Fund summary judgment on Plaintiffs' § 502(a)(1)(B) claim and deny the same to Plaintiffs.

## II. The Fund's motion to dismiss Count II

The Court next considers PIUMPF's motion to dismiss Plaintiffs' equitable-estoppel claim brought pursuant to ERISA § 502(a)(3) (Count II). This claim aims to estop the Fund from rescinding Plaintiffs' pensions due to alleged misrepresentations the Fund made that induced Plaintiffs to retire.

### A. Standard of review

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court takes "all well-pleaded material allegations of the pleadings" as true. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (internal quotation marks omitted). The factual allegations in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50 (2009)). "However, a legal conclusion couched as a factual allegation need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action

sufficient." *Id*. (internal quotation marks omitted).

   *B. Law*

ERISA § 502(a)(3) states that a civil action may be brought "by a participant, beneficiary, or fiduciary to enjoin any act or practice which violates . . . the terms of [an ERISA] plan, or to obtain other appropriate equitable relief to redress such violations or to enforce . . . the terms of the plan." 29 U.S.C. § 1132(a)(3) (internal numbering omitted). The Supreme Court has "interpreted the term 'other appropriate equitable relief' in § 502(a)(3) as referring to those categories of relief that, traditionally speaking (*i.e.*, prior to the merger of law and equity) were *typically* available in equity." *Amara*, 131 S. Ct. at 1878 (internal quotation marks omitted). *Amara* specifically identified contract reformation, estoppel, and surcharge as traditional equitable remedies. *Id*. at 1879–80.

Equitable estoppel "precludes a party from exercising contractual rights because of his own inequitable conduct toward the party asserting the estoppel." *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 443–44 (6th Cir. 2010) (internal quotation marks omitted). It "operates to place the person entitled to its benefit in the same position he would have been in had [the representations made] been true." *Amara*, 131 S. Ct. at 1880 (internal quotation marks omitted). In the Sixth Circuit, the elements of an estoppel claim are:

> 1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; 4) unawareness of the true facts by the party asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

12

*Bloemker*, 605 F.3d at 442. In the case of unambiguous pension-plan provisions, equitable estoppel may be invoked if the plaintiff can make out "the traditional elements of estoppel, . . . plus (1) a written representation; (2) plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and (3) extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." *Id*. at 444. If a pension plan's provisions are ambiguous, however, only the traditional elements of an estoppel claim are relevant. *See, e.g.*, *Smiljanich*, 302 F. App'x at 448–49. Because the Court has already determined that the provision at issue—the phrase "had then" in Article III, Section 1(b)(4) of the Plan—is ambiguous, Plaintiffs must plead sufficient factual matter with respect to the five traditional estoppel elements to survive the Fund's dismissal motion.

### C. Analysis

Plaintiffs allege they relied on written and oral representations PIUMPF made to their union concerning the ability of older employees to get Pension Credit for past service in the paper industry. (*See, e.g.*, Docket No. 50 at 5, 17–19). These representations, Plaintiffs say, were consistent with their understanding that the 880-hour requirement could be satisfied at any time, and not necessarily by or before February 28, 1980. Plaintiffs point to a letter dated August 11, 2004, that PIUMPF faxed to their union as the union's members considered which pension plan the union and their employer should adopt. That letter—which stated that "[PSC] is granted if you are employed with the company at the time they [sic] start participation in PIUMPF and work 880 hours of future service under covered employment in PIUMPF"—excluded any temporal limitation on when the 880-hour requirement had to be met. (Docket No. 54-1 at 35).

The first element of Plaintiffs' estoppel claim is that PIUMPF made a representation of

13

material fact. "A misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002) (internal quotation marks and alteration omitted). There is little doubt a reasonable reader would be very likely to be misled by the letter's description of how PIUMPF beneficiaries can get PSC. Nowhere does the letter suggest an employee has to satisfy the 880-hour requirement by a certain date, let alone that he must have met it 24 years earlier.

The second element requires Platintiffs to allege that PIUMPF was aware of the true facts. To satisfy this element, a plaintiff must allege that "the defendant's actions contained an element of fraud, either intended deception or such gross negligence as to amount to constructive fraud." *Bloemker*, 605 F.3d at 443 (internal quotation marks, alteration, and citations omitted); *see also Trs. of Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 591 (6th Cir. 2000) (citing *TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 350 (6th Cir. 1979), for the proposition that an estoppel claim requires a showing of either "misrepresentations, affirmative acts of misconduct, or intentionally misleading silence"). Reading Plaintiffs' pleadings indulgently, Plaintiffs have adequately alleged that PIUMPF acted with fraudulent intent or gross negligence amounting to constructive fraud.

At first blush, a reasonable observer might view the representation in the Fund's letter as "an honest mistake," making PIUMPF at most "guilty of misfeasance, not the malfeasance that estoppel requires." *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 431 (6th Cir. 2007). After all, PIUMPF argues, Plaintiffs only had to review the Plan or the SPD to figure out that the letter was inconsistent with those two documents. (Docket No. 62 at 12). The trouble is that Plaintiffs

14

would not have understood the inconsistency by simply looking at the Plan and the SPD. That's because the meaning of the relevant Plan language—the time period to which "had then" refers—is ambiguous. And the SPD only confuses matters, as its use of the word "thereafter" in lieu of "had then" supports Plaintiffs' view that the Plan did not require them to meet the 880-hour requirement by or before February 27, 1980.[4]

Several other considerations weigh against PIUMPF on the question whether Plaintiffs have adequately alleged that the Fund's actions contained an element of fraud. First, PIUMPF had something to gain by misrepresenting the requirements older employees would have to satisfy to get PSC. *Cf. Pearson v. Voith Paper Rolls, Inc.*, 656 F.3d 504, 509 (7th Cir. 2011) (noting that plaintiff could not demonstrate intentional misrepresentation because plan had no incentive to provide incorrect information). When the alleged misrepresentation was made, Plaintiffs' employer and union were deciding whether Plaintiffs and their coworkers should join PIUMPF. Against that backdrop, the Fund had a plausible reason to fudge details about how older workers would receive pension benefits in order to secure the pension contributions of 350 LPT employees. And when the Fund decided to terminate Plaintiffs' benefits, it plausibly had an incentive to nix its obligations to two beneficiaries so as to stanch investment-related losses.

More, PIUMPF is positioned better than any other player here—the employer, the employees, and the union—to explain its rather nuanced view of the time period the phrase "had then" describes. Even though the Fund is the party most capable of correctly communicating the

---

[4] Plaintiffs do not base their equitable-estoppel claim on an alleged representation contained in PIUMPF's SPD, but they could. While the "terms of an SPD cannot be enforced over conflicting terms of the employee benefit plan itself under ERISA § 502(a)(1)(B)," *CIGNA* "left open the possibility that 'appropriate equitable relief' could potentially be awarded under § 502(a)(3)" in such a case. *Lipker*, 698 F.3d at 931 n.4.

15

Plan's requirements, it failed to do so. Instead, the Fund offered three different documents (the Plan, the SPD, and the letter) that provided three different glosses on this issue. Given that PIUMPF's alleged representation was the linchpin of the decisions Crawford and Shorette made to retire after three decades of work, at this time a trier of fact could reasonably infer that PIUMPF's failure to get the critical timing details right was more than just an honest mistake. Plaintiffs have alleged sufficient facts to support a conclusion that PIUMPF's representation was intended to deceive them or so grossly negligent as to work a constructive fraud upon them.

The third estoppel element requires Plaintiffs to sufficiently allege that PIUMPF intended Plaintiffs to act on its representation or that PIUMPF, by its conduct, made Plaintiffs believe it intended them to act on the representation. Again, PIUMPF distributed the August 11, 2004 letter describing PSC eligibility when Plaintiffs' employer and union were deciding whether or not to join the Fund. Plaintiffs sufficiently allege that PIUMPF offered this explanation of how the Fund awarded credit for past service to (successfully) convince their employer and union to sign up with the Fund, and thus enable PIUMPF to expand the base of employees paying into it. This makes out the third estoppel element.

As to the fourth element, Plaintiffs must allege that they were unaware of the true facts. They have done so, stating they didn't know of any variations in the Plan contradicting the August 11, 2004 letter. (Docket No. 50 at 10, 19). Because the relevant Plan terms are ambiguous and because the SPD is not clearly consistent with the Plan (or, for that matter, clearly inconsistent with the letter), reference to those sources would not have made Plaintiffs aware of the terms as PIUMPF now casts them. Plaintiffs sufficiently allege that they didn't know they had to meet the 880-hour requirement by February 27, 1980 to be eligible for PSC.

16

Finally, the fifth estoppel element requires Plaintiffs to allege that they justifiably and detrimentally relied on PIUMPF's representation. Plaintiffs' communications with PIUMPF during the pendency of their internal appeals make clear that each has done so. Crawford wrote:

> Before choosing to retire I did all the right things including asking for an understanding of what I would receive for benefits. I made my decision to retire based on what I was given for information . . . . I attended meetings in 2004 when the PIUMPF plan was explained to the membership of my Local Union. We were told that PIUMPF would give us credit for all of our service in the paper industry once we had worked 880 hours. In 2004 alone . . . I worked over 900 hours. In 2005 I worked over 1900 before retiring. In August of 2005 I was told that I had been given credit for my years in the industry. Now you send me a letter—after I made the life changing decision to retire entirely because of what you told me—and you tell me that you want all the money back? . . . . If you had told me in 2005 that I wasn't eligible to retire I would not have left my employment with Lincoln Paper & Tissue. Now I have broken that employment tie and cannot go back to work. You also need to know that I cannot live without the income that you promised me . . . . I was told one thing and based my life's decisions on the way you represented I would be treated. Now you have pulled the rug out from under me and I don't know how I am going to live.

(Docket No. 54-1 at 21–22) (paragraph breaks omitted). Shorette made similar claims:

> Like all of my co-workers I was told in a meeting in 2004 that I would receive credit for all of my years in the paper industry once I worked 880 hours at Lincoln Paper and Tissue. I . . . worked over 1,000 hours through the end of 2004. In 2005 I worked over 1200 hours before I had medical problems that made it so I had to think about ending my working life . . . . I worked for over 29 years in the paper industry. When I faced the need to retire I asked what my benefit would be and PIUMPF told me I would receive $1142.00 each month for the 60 months [sic] plan. Once I got that information I made my decision to retire and leave my employment in the industry . . . . If PIUMPF had told me I couldn't get my pension disability I would have had to continue working as long as I could—maybe until I died. Now I have retired and can't go back to work even if I wanted to . . . . I worked more than the 880 hours you told me I needed. And when I asked about my ability to retire you told me I could. Now you change your mind and you want all this money back? This is so rotten.

(Docket No. 1-4 at 30–31) (paragraph breaks omitted). Plaintiffs' reliance was reasonable

17

because they had no reason to doubt the reliability of PIUMPF's representation. Moreover, Plaintiffs allege they suffered legal detriment by virtue of their reliance in that they relinquished secure employment. This is surely an adverse change in position. Plaintiffs' allegations are sufficient to show they justifiably and detrimentally relied on PIUMPF's representation.

Assuming the truth of Plaintiffs' allegations, Plaintiffs have plausibly stated a claim for relief in the form of equitable estoppel. As a result, the Court rejects the Magistrate Judge's recommendation and denies PIUMPF's motion to dismiss Count II.

### III.     The Fund's motion for summary judgment on its counterclaims

The Court finally considers the Fund's request for summary judgment on the counterclaims it lodged against Plaintiffs, which seek to recover erroneously paid pension benefits. (Docket No. 63 at 8–10). Since Plaintiffs have stated an equitable-estoppel claim, they still have a path to establish their entitlement to pension benefits. Until judgment is entered against Plaintiffs on each avenue of relief they claim, the Court cannot conclude the Fund paid Plaintiffs erroneously. The Fund's request for summary judgment on its counterclaims is denied without prejudice.

## **CONCLUSION**

For the reasons stated, the Court will:

- ACCEPT the Magistrate Judge's R & Rs recommending summary judgment for Defendant and against Plaintiffs with respect to Plaintiffs' denial-of-benefits claim (Count I), (Docket Nos. 91 & 114);
- DENY Plaintiffs' summary-judgment motion as to Count I, (Docket No. 68);
- GRANT Defendant's summary-judgment motion as to Count I, (Docket No. 94);

- REJECT the Magistrate Judge's R &R recommending dismissal of Plaintiffs' equitable-estoppel claim (Count II), (Docket No. 92);

- DENY Defendant's motion to dismiss Count II, (Docket No. 61);

- REJECT the Magistrate Judge's R & R recommending judgment for Defendant on its counterclaims against Plaintiffs for previously paid benefits, (Docket No. 114); and

- DENY WITHOUT PREJUDICE Defendant's summary-judgment motion as to its counterclaims, (Docket No. 94).

The Court will return this matter to the Magistrate Judge for further pretrial management. An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE